UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOMINIC M. FRANZA,

                              Plaintiff,

        v.

TINA M. STANFORD, *et al.*,

                              Defendants.

No. 18-CV-10892 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Dominic M. Franza
Beacon, NY
*Pro se Plaintiff*

Neil Shevlin, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Pro se Plaintiff Dominic M. Franza ("Plaintiff"), currently incarcerated at Fishkill

Correctional Facility, brought suit against New York State Board of Parole Chairwoman Tina M.

Stanford ("Stanford"), Commissioners Erik Berliner ("Berliner"), Charles Davis ("Davis"),

Tyece Drake ("Drake"), Caryne Demosthenes ("Demosthenes"), and Marc Coppola ("Coppola"),

and Chief Counsel Kathleen M. Kiley (Kiley; collectively, "Defendants") pursuant to 42 U.S.C.

§ 1983.  (*See* Second Am. Compl. ("SAC") (Dkt. No. 40).)  Plaintiff alleges that Defendants

violated his rights under the Fourteenth Amendment and Supreme Court precedent in *United

States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

Before the Court is Defendants' Motion To Dismiss (the "Motion"), pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Not. of Mot. To Dismiss ("Defs.' Mot.") (Dkt. No. 43); Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 44).) For the following reasons, Defendants' Motion is granted.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint ("SAC"), including all attached documents. *See Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (accepting "all factual allegations as true" for the purposes of a motion to dismiss and deeming a complaint to include "any written instrument attached to it as an exhibit" (citations omitted)).

#### 1. The New York Parole Scheme

Under New York State law, at least one month prior to the date on which an inmate is eligible for parole, an inmate must be interviewed by members of the Parole Board to "determine whether he should be paroled in accordance with the guidelines adopted pursuant to subdivision four of section two hundred fifty-nine-c of this article." N.Y. Exec. Law § 259-i(a)(i). In relevant part, these guidelines ("§ 8002.2") provide that "[i]n making a release determination, the Board shall be guided by risk and needs principles, including the inmate's risk and needs scores as generated by a periodically-validated risk assessment instrument, if prepared by the Department of Corrections and Community Supervision (collectively, 'Department Risk and Needs Assessment')." 9 N.Y. Comp. Codes R. & Regs., tit. 9, § 8002.2(a) (2017). Moreover, "[i]f a Board determination, denying release, departs from the Department Risk and Needs Assessment's scores, the Board shall specify any scale within the Department Risk and Needs Assessment from which it departed and provide an individualized reason for such departure." *Id.*

As part of the New York State rulemaking process, the Department of Corrections also issued a "Notice of Adoption" wherein it clarified that the Parole Board "will specify any scale within the assessment from which it departed that impacted its decision." (SAC Exhibits 23.)[1]

## 2. The November 14, 2017 Interview

Plaintiff is currently serving a sentence of 25 years to 50 years in the New York State Prison system after conviction in New York County on three counts of attempted murder in the second degree and one count of possession of a dangerous weapon in the first degree. (*Id.* at 30, 56.) Despite those convictions, Plaintiff maintains his innocence. (*Id.* at 38–40, 75.) On June 16, 2017, Offender Rehabilitation Counselor Victor Gallo prepared Plaintiff's "Risk and Needs Assessment" in advance of his upcoming Board of Parole interview. (SAC ¶ 13.) The Risk Assessment includes "Criminogenic Need Scales," with scores associated with such categories as "Risk of Felony Violence," "Arrest Risk, "Abscond Risk," "Criminal Involvement," and "Negative Social Cognitions," among others. (SAC Exhibits 26.) Plaintiff's Risk Assessment indicated "low" and "unlikely" risk in all such categories. (*Id.*)

On November 14, 2017, Plaintiff appeared before a panel that consisted of Defendants Demosthenes, Coppola, and Davis for his Board of Parole interview. (SAC ¶ 15.) The interview was "a non-adversarial type proceeding" and took place "without the full panoply of procedural safeguards." (*Id.*) Demosthenes conducted the interview, and he acknowledged on the record that Plaintiff's risk assessment was "low across the board." (SAC Exhibits 34.) Nevertheless, the panel denied parole. (*Id.* at 51.) In rendering its decision, the panel determined that "if released at this time, there is a reasonable probability that [Plaintiff] would not live at liberty

---

[1] Citations to the SAC itself will refer to "SAC" followed by paragraph number; citations to exhibits attached to the SAC and included at the same docket entry, (Dkt. No. 40), will refer to "SAC Exhibits" followed by ECF-stamped page number.

without violating the law," and that his "release at this time is incompatible with the welfare and safety of the community." (*Id.*) The panel also noted the "heinous[ness]" of Plaintiff's crime and that his "disciplinary record reflects multiple sanctions which indicates lack of compliance to institutional rules." (*Id.* at 51–52.) However, Plaintiff alleges, the panel "did not specify any scale that was departed from, nor a factually individualized reason for a departure being presented." (SAC ¶ 16.)

Plaintiff filed an administrative appeal, requesting a new interview primarily on the grounds that Demosthenes, Coppola, and Davis "violated 9 NYCRR §§ 8002.2(a) and 8002.3(b), as Defendants did not specify any scale within the Risk and Needs Assessment instrument for a departure, and did not provide a factually individualized, and in non-conclusory terms, reason for any departure." (*Id.* ¶ 17.)[2] As part of that same appeal, Plaintiff also pointed to a discrepancy between the certified transcript of his interview with the Parole Board panel and the formal "Parole Board Release Decision Notice," and he suggested that the discrepancy reflected an "intentional act" to "tamper[] with" the decision. (SAC Exhibits 58.)[3] The Parole Board's

---

[2] 9 N.Y.C.R.R. § 8002.3 provides:

> If parole is not granted, the inmate shall be informed in writing, within two weeks of his or her interview, of the decision denying him or her parole and the factors and reasons for such denial. Reasons for the denial of parole release shall be given in detail, and shall, in factually individualized and non-conclusory terms, address how the applicable parole decision-making principles and factors listed in 8002.2 were considered in the individual's case. The Board shall specify in its decision a date for reconsideration of the release decision and such date shall be not more than 24 months from the interview.

N.Y. Comp. Codes R. & Regs. tit. 9, § 8002.3(b) (2017).

[3] Although Plaintiff does not attach the Decision Notice that he alleges was tampered with, Defendants have included a copy of that Decision Notice as Exhibit A to the Declaration of Neil Shevlin. (Dkt. No. 45.) The Decision Notice is identical to the decision portion of the transcript except that it includes the following additional sentences at the end:

Appeals Unit subsequently reversed the November 14, 2017 decision and granted Plaintiff a new interview "in the interest of fairness in" light of the discrepancy between the certified transcript and the Decision Notice (which the Appeals Unit believed resulted from an "inadvertent[]" omission from the transcript). (*Id.* at 70.)

### 3. The April 17, 2018 Interview

On April 17, 2018, Plaintiff again appeared before a panel of Parole Board, this time consisting of Defendants Berliner and Shapiro. (SAC ¶ 20.) Again, the panel acknowledged that Plaintiff's risk assessment scores were "low for everything," (SAC Exhibits 81), but concluded that "release on parole is not appropriate at this time" in light of Plaintiff's "lack of insight into the circumstances that led to three counts of attempted murder in the second," (*id.* at 93). The panel explained that "[d]iscretionary release at this time is incompatible with the welfare of society," and expressed "hope that [Plaintiff] will use this time gain insight into [his] relationships with women and how [to] handle disagreements with family members." (*Id.*) Again, Plaintiff alleges that the panel "did not specify any scale that was departed from, nor a factually individualized reason for a departure being presented." (SAC ¶ 21.)

Plaintiff filed an administrative appeal, again claiming that the panel disregarded governing regulations and was therefore invalid. (*Id.* ¶ 22.) In particular, Plaintiff argued that

---

The Panel has considered your low COMPAS risk scores. However, you displayed no emotions for the victim and the family's suffering yet you profess to have loved your wife. Note of [sic] made of public opposition to your release. Sentencing minutes and case plan have bene [sic] considered, including your risk to the community, rehabilitation efforts and your need for successful community re-entry. Your discretionary release at this time would not be compatible with the welfare of society and would tend to deprecate the seriousness of the instance offense as to undermine respect for the law.

(*Id.*) Defendants maintain that these final sentences were simply omitted from the transcripts "inadvertently." (*See* Defs.' Mem. 5.)

"Defendants did not specify any scale within the Risk and Needs Assessment instrument for a departure, and did not provide a factually individualized, and in non-conclusory terms, reason for any departure." (*Id.* ¶ 25.) On October 10, 2018, the Appeals Unit issued its Administrative Appeal Decision affirming the panel's denial of parole. (SAC Exhibits 107–15.) In its accompanying statement, the Appeals Unit explained that there are "several more pages of narrative and scales contained in the COMPAS instrument that the Board also reviewed and considered" but that Plaintiff ignored in his appeal. (*Id.* at 113.) The Appeals Unit also explained that "in deviating from the low COMPAS scores[, the Board] looked at all of these factors as well as all of the other records before it," and that "reasons for departure from certain COMPAS scores were stated in the Board's decisions as follows: Appellant's lack of insight into the multiple crimes he committed; the Board's finding that his ability live an honest life is an issue; his need to build contacts with his family and agencies to support a release on parole; his sentencing minutes; and his need to gain insight into his relationships with women, and how to handle disagreements with family members." (*Id.*)[4]

Plaintiff alleges that the signatories to the Administrative Appeals Decision, Defendants Stanford, Davis, and Drake, "rubber stamped" the decision and "did not even read the record relied upon" in the Appeals Unit's statement of its "Findings and Recommendation." (SAC ¶ 29.) As support for this allegation, Plaintiff points to one page of the Appeals Unit's statement, where, in a section title "The Record," the statement appears to include several sentences relating

---

[4] Although Plaintiff has not attached the formal Parole Board Release Decision Notice from the April 17, 2018 panel to his SAC, he has attached a transcript of that panel's oral decision. That transcript substantially supports the Appeals Unit's account, including statements about Plaintiff's "lack of insight in the circumstances" of his crimes and the "hope that [he] would use this time to gain insight into [his] relationships with women and . . . family members." (SAC Exhibits 93.)

to a case other than Plaintiff's own.  (*Id.*)[5]  Defendants admit that the section "inadvertently referenced another inmate's criminal record, not [P]laintiff's."  (Defs.' Mem. 6.)

On October 17, 2018, the Appeals Unit issued an amended "Appeal Decision Notice" and statement of "Findings & Recommendation."  (SAC ¶ 31; SAC Exhibits 117–24.)  The amended statement appears to be identical to the October 10, 2018 statement, except for the removal of the section titled "The Record."  (SAC ¶ 33; SAC Exhibits 117–24.)

Plaintiff alleges that "Defendant Kiley, during the circumstances herein did not ensure the Defendants were in conformance with Federal and State law, and the adopted rules, as well failing to ensure the Statement of Appeals Units Finding and Recommendation was in conformance with Federal and State law, and the adopted rules."  (SAC ¶ 34.)

### 4.  April 17, 2019 Interview

On April 17, 2019, Plaintiff appeared before Commissioner Tana Agostini and Defendant Demosthenes for his next Board of Parole interview.  (*Id.* ¶ 34.)  This panel again denied Plaintiff parole, explaining that Plaintiff's "indignation about [his] incarceration spoke louder than [his] concern or compassion for any of [his] victims," and that while his COMPAS risk assessment scores indicated "low risk for re-offense," the panel would nonetheless depart from that assessment based on Plaintiff's "evident anger and the self-aggrandizing nature with which [he] perceive[s] others."  (SAC Exhibits 127–28.)  Plaintiff believes that this panel's decision,

---

[5] The statement explains that "[t]he record as a whole . . . reflects [that] the Board considered the appropriate factors, including: the instant murder offense, involving the brutal stabbing of a woman and Appellant's efforts at a 'coverup for what I did' (see transcript of Board interview held on May 9, 2018 at page 6, line 1); Petitioner's criminal history . . . ."  (SAC Exhibits 114.)  Plaintiff's hearing took place on April 17, not May 9; involved a shooting rather than a stabbing; and Plaintiff has maintained his innocence rather than admitting to a cover-up.

unlike prior Parole Board decisions, "followed the mandate of 9 NYCRR [§ 8002.2(a)]," as it "identif[ied] the scale from which a departure was being made."  (SAC ¶ 36.)

### B.  Procedural History

Plaintiff filed his initial Complaint on November 21, 2018, and subsequently filed two amended complaints.  (Compl. (Dkt. No. 1); First Am. Compl. (Dkt. No. 18); SAC.)  On July 19, 2019, Defendants filed the instant Motion.  (*See* Defs.' Mot.; Defs.' Mem.)  Plaintiff filed a response on August 13, 2019.  (Pl.'s Aff. in Opp'n to Defs.' Mot. (Dkt. No. 46); Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Mem.") (Dkt. No. 47).)  Defendants filed a reply on September 3, 2019. (Defs.' Mem. of Law in Further Supp. of Defs' Mot. ("Defs.' Reply") (Dkt. No. 48).)

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Defs.' Mem.)  The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.*  (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be

supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion, the Court is required to "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Sierra Club*, 911 F.3d at 88. Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted);

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation

marks omitted).  However, when the Plaintiff is pro se, the Court may consider "materials

outside the complaint to the extent that they are consistent with the allegations in the complaint,"

*Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013)

(quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition

papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010)

(italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for

a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL

5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or

knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d

81, 88 (2d Cir. 2000).

B.  Analysis

Plaintiff seeks damages and declaratory relief for alleged violations of the Fourteenth

Amendment and the *Accardi* doctrine.  (SAC ¶ 52(A)–(D).)  In moving for dismissal of

Plaintiff's claims, Defendants argue that Defendants are entitled to absolute immunity; that

Plaintiff has failed to state a claim under the Fourteenth Amendment; that the *Accardi* doctrine

does not apply to federal Constitutional claims against states and their employees; that Plaintiff's

claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); and that Defendants are entitled to

qualified immunity.  (*See generally* Defs.' Mem.)  This Court addresses several of Defendants'

arguments, but only to the extent necessary to resolve the instant Motion.

1.  Absolute Immunity

It is "well established" that Parole Commissioners are entitled to absolute immunity from

suit for damages for actions taken in the course of affirming or denying an inmate's parole

decision. *Victory v. Pataki*, 814 F.3d 47, 66 (2d Cir. 2016) (citation omitted); *see also King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999) (noting that "parole board officials . . . are entitled to absolute immunity when they decide to grant, deny, or revoke parole" (citation, alteration, and quotation marks omitted)); *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) ("[P]arole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." (citations omitted)). Moreover, absolute immunity extends beyond adjudication itself, shielding officials when they are engaged in functions "integrally related to the judicial process." *Dorman v. Higgins*, 821 F.2d 133, 136 (2d Cir. 1987). Thus, for example, federal probation officers benefit from absolute immunity when they prepare and provide courts with presentence reports because these reports "are normally an important part of a federal court proceeding," and thus the probation officer "acts as an arm of the court" in producing and providing them. *Id.* at 137.

However, when officials act outside of their "quasi-adjudicative" roles (or their functions which are "integrally related to the judicial process"), their conduct is not absolutely protected. *See King,* 189 F.3d at 288 (citation omitted). Thus, for example, when a parole officer recommends that a warrant be issued for the arrest of a parolee, this action is not subject to absolute immunity because the officer acts in an "administrative rather than adjudicative" capacity. *Id.; see also Scotto v. Almenas*, 143 F.3d 105, 111–13 (2d Cir. 1998) (rejecting an immunity defense in such a case). Similarly, a Parole Commissioner is not protected by absolute immunity when he or she participates in the "fabrication of evidence . . . before the initiation of rescission proceedings" because an official "cannot immunize for [§] 1983 purposes all unlawful conduct performed prior to and independent of a later immunized act, merely by subsequently engaging in conduct entitled absolute immunity." *Victory*, 814 F.3d at 66 (citations omitted).

Here, there is no question that Defendants Stanford, Berliner, Davis, Drake, Demosthenes, and Coppola were serving as Parole Commissioners in their "quasi-adjudicative" capacity when they took the actions alleged in the SAC. In particular, Plaintiff alleges that in the course of rendering the panel's parole decision at the November 14, 2017 hearing, Demosthenes "did not specify any scale that was departed from" and that Coppola and Davis "concur[ed]." (SAC ¶¶ 15–16.) Similarly, Plaintiff alleges that at in the course of rendering their parole decision at the April 17, 2018 hearing, Shapiro "did not specify any scale that was departed from" and that Berliner "concur[ed]." (*Id.* ¶¶ 20–21.) Plaintiff also alleges that Stanford, Davis, and Drake "rubber stamped the Administrative Appeal Decision Notice" and "did not read the Statement of Appeals Unites Findings and Recommendation." (*Id.* ¶¶ 29–30, 33.) These are the only actions that Plaintiff ascribes to these Defendants. As each alleged action occurred in the course of a parole hearing and the rendering of a parole decision, each is indisputably a function of the Commissioners' adjudicative role. *See Montero,* 171 F.3d at 760 ("[W]hen [the defendant] presided over [the plaintiff's] parole revocation hearing, [the defendant] was performing an adjudicative function."); *see also Krebs v. N.Y. State Div. of Parole*, No. 08-CV-255, 2009 WL 2567779, at *6 (N.D.N.Y. Aug. 17, 2009) (explaining that "parole commissioners who participated in the decisions to deny [a plaintiff] release on parole" were "engaged in a quasi-adjudicative function when voting to deny him parole" and so were protected by absolute immunity).

Plaintiff seeks to escape this straightforward conclusion by arguing that Defendants' obligation to comply with § 8002.2 in rendering their decision is a "non-discretionary" function and thus not subject to absolute immunity. In support of this argument, Plaintiff relies on *Westfall v. Erwin*, 484 U.S. 292 (1988), for the principle that "absolute immunity for

nondiscretionary functions finds no support in the traditional justification for official immunity." *Id.* at 297. Plaintiff's argument fails for several reasons. First, *Westfall* concerned the immunity of federal officials from state law suit; it says nothing about the absolute immunity of officials from suits based in federal law. *See id.* at 293. Second, Congress expressly superseded *Westfall*'s "nondiscretionary function" limitation by means of the Federal Employees Liability Reform and Tort Compensation Act of 1988. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 426 (1995) (discussing the passage of this law and its effect on *Westfall*). Third, although the principles governing state officer qualified immunity may once have mirrored *Westfall's* distinction between discretionary and ministerial tasks, *see Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir. 1995) (explaining that qualified immunity is unavailable for ministerial tasks), *cert. denied*, 515 U.S. 1131 (1995), the Second Circuit has more recently cast doubt on the "continued validity of the ministerial-discretionary function distinction in determining qualified immunity," *Varrone v. Bilotti*, 123 F.3d 75, 82 (2d Cir. 1997) (collecting cases). Moreover, it is far from clear that the same limitations on officials' qualified immunity apply to the absolute immunity that shields those operating in their adjudicative capacities. *See Mireles v. Waco*, 502 U.S. 9, 11–12 (1991) (explaining that judicial immunity "is overcome in only two sets of circumstances": (1) "actions not taken in the judge's judicial capacity" and (2) "actions, though judicial in nature, taken in the complete absence of all jurisdiction" (citations omitted)); *Fields v. Soloff*, 920 F.2d 1114, 1119 (2d Cir. 1990) ("A judge defending against a [§] 1983 suit is entitled to absolute immunity from damages for actions performed in his judicial capacity. . . . Liability will not attach where a judge violated state law by an incorrect decision." (citations omitted)). Finally, while Plaintiff characterizes his suit as narrowly challenging Defendants' purported failure to comply with § 8002.2, any such failure was simply a feature of Defendants' parole

decisions—clear exercises of adjudicative power involving a great deal of discretion. *See Montero*, 171 F.3d at 760 (explaining that parole board officials deciding whether to grant, deny, or revoke parole are engaged in an "adjudicative function"); *see also Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009) ("[A]cts arising out of, or related to, individual cases before the judge are considered judicial in nature.").[6]  Plaintiff's invocation of *Westfall* is thus unavailing.

In sum, because Defendants Stanford, Berliner, Davis, Drake, Demosthenes, and Coppola were parole board officials acting in their quasi-adjudicative roles, they are "entitled to absolute immunity from suit for damages." *See Victory*, 814 F.3d at 66.[7]

2. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted).  Qualified immunity shields a defendant from

---

[6] Plaintiff's argument would render immunity defenses meaningless.  After all, nearly all suits brought against public officials (and certainly all suits brought under § 1983) allege violations of *some* law.  If mere non-compliance with law, even when part of a larger discretionary or adjudicative activity, amounted to a "ministerial" act, immunity would never apply.  Unsurprisingly, this is not the law.  *Fields,* 920 F.2d at 1119. ("Liability will not attach where a judge violated state law by an incorrect decision.")

[7] Although Defendant Kiley is Chief Counsel, not a Commissioner, of the New York State Parole Board, she is likely shielded by absolute immunity as well.  As the Second Circuit has explained, absolute immunity extends to officials performing functions that are "integrally related to the judicial process." *Dorman*, 821 F.2d at 136.  Thus, for example, federal probation officers' preparation of presentence reports is protected by absolute immunity because these reports "are normally an important part of a federal court proceeding," and the probation officer "acts as an arm of the court" in producing them. *Id.* at 137.  It seems the same should be true of a Parole Board's general counsel advising Board members. *See Hulsey v. Owens*, 63 F.3d 354, 357 and n.6 (5th Cir. 1995) (explaining that the "general counsel of the Texas Board of Pardons and Paroles is entitled to the same immunity against claims involving parole revocations as that afforded to Board members themselves").  We need not reach this issue, however, as Kiley is clearly shielded by qualified immunity as well.

standing trial or facing other burdens of litigation "whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for [the official] to believe that his action did not violate such law." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (alteration in original) (citation and quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendants' position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted).

Given that "qualified immunity is not only a defense to liability, but also provides immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity . . . 'at the earliest possible stage in litigation.'" *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016) (quoting *Pearson*, 555 U.S. at 231–32). "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004) (citations, italics, and quotation marks omitted). As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept [that] . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* at 436 .

Here, Plaintiff has failed to allege that Kiley violated Plaintiff's clearly established federal rights. In fact, Plaintiff's only allegations concerning Kiley are that she (1) "is responsible, along with Defendant Stanford, to ensure all the Commissioners are following the laws of the State of New York," (SAC ¶ 6), and (2) "did not ensure the Defendants were in conformance with Federal and State law, and the adopted rules, as well failing to ensure the Statement of Appeals Units Finding and Recommendation was in conformance with Federal and State law, and the adopted rules," (*id.* ¶ 34).

These allegations fail to overcome Kiley's qualified immunity defense for several reasons. First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for the violation of a clearly established right. *Iqbal*, 556 U.S. at 678 (citation omitted) (disregarding a plaintiff's conclusory statements

and therefore applying qualified immunity).[8]  Plaintiff has alleged no specific actions by Kiley.

On the contrary, Plaintiff's allegation that Kiley "failed to ensure" other defendants' compliance

is precisely the sort of statement that courts regularly hold to be unacceptably "conclusory."  *See*

*Shepherd v. Fischer*, No. 10-CV-1524, 2015 WL 1246049, at *12 (N.D.N.Y. Feb. 23, 2015)

(dismissing a claim that officials "fail[ed] to ensure their subordinates were properly and

adequately trained" as a "vague and conclusory allegation"), *adopted by* 2015 WL 1275298

(N.D.N.Y. Mar. 18, 2015); *Seymore v. Dep't of Corr. Servs.*, No. 11-CV-2254, 2014 WL

641428, at *6 (S.D.N.Y. Feb. 18, 2014) (dismissing a claim that the defendant "failed to ensure

the adequacy of prison inspections" as a "conclusory allegation"); *Sedona Corp. v. Ladenburg*

*Thalmann & Co., Inc.*, No. 03-CV-3120, 2009 WL 1492196, at *10 (S.D.N.Y. May 27, 2009)

(dismissing the allegation that the defendant was "failing to ensure that its trading was in

compliance with state and federal laws" as "conclusory" where there were "no factual allegations

in the SAC concerning [the defendant's] alleged short selling activity" (quotation marks

omitted)).

Second, Kiley is entitled to qualified immunity because no "existing precedent . . . [has]

placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S.

731, 741 (2011) (citations omitted).  As applied to the facts here, this is a vast understatement.

Plaintiff has offered not a single precedent from any court in support of his assertion that a

failure to adhere to state regulations in explaining parole decisions constitutes a violation of an

inmate's Fourteenth Amendment rights, let alone that a "failure to ensure" *others'* adherence

---

[8] Even without the defense of qualified immunity, the conclusory nature of all allegations against Kiley would necessitate the dismissal of these claims because such claims fail to comply with Fed. R. Civ. P. 8(a)(2).  *See Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . ." (citation omitted)).

with a particular (non-authoritative) interpretation of these state regulations constitutes such a violation. Under such circumstances, it is impossible to say that Kiley violated "clearly established law."[9] *See Naumovski*, 934 F.3d at 210; *see also Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 61 (2d Cir. 2014) (explaining that out-of-circuit district court precedent is insufficient to render a right clearly established); *Doninger*, 642 F.3d at 345 (requiring that the Supreme Court or the Second Circuit has confirmed the existence of the right for it to be "clearly established").[10]

3. Declaratory Relief

While absolute and qualified immunity foreclose all claims for damages, they do not necessarily preclude declaratory relief. *See Pulliam v. Allen*, 466 U.S. 522, 541 (1984) (explaining that suits for prospective relief, such as injunctive and declaratory relief rather than damages, are permitted even where defendants have absolute immunity); *MacPherson v. Town of Southampton*, 664 F. Supp. 2d 203, 211 (E.D.N.Y. 2009) ("To the extent Plaintiffs seek prospective declaratory relief, . . . Plaintiffs' claims are not barred by judicial immunity." (citations omitted)). However, courts generally hold that where public official defendants are

---

[9] Although claims against the other Defendants were dismissed on the basis of absolute immunity, the same absence of "clearly established law" also precludes claims against them as well. Accordingly, qualified immunity provides an alternative basis for dismissal with respect to all Defendants.

[10] Plaintiff's only argument against the applicability of qualified immunity is to rely on *Tellier v. Fields*, 280 F.3d 69, 86 (2d Cir. 2000), and assert that Defendants failed to "discharge the very regulations [they are] entrusted to discharge dutifully and in good faith." (*See* Pl.'s Mem. 25.) In advancing this argument and relying on *Tellier*, Plaintiff effectively argues that Defendants are not shielded by qualified immunity because they did not act "in an objectively reasonable manner." *Id.* at 85–86. This Court need not (and does not) reach the issue of whether Defendants' conduct was "objectively reasonable," however, because Plaintiff does not (indeed, cannot) argue that Defendants behavior was a violation of "clearly established law."

shielded by absolute or qualified immunity, purely retrospective declaratory relief is inappropriate. *See S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994) ("[W]here the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed." (citation and quotation marks omitted)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (explaining that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy"); *Marshall v. N.Y. State Pub. High Sch. Athletic Ass'n, Inc.*, 374 F. Supp. 3d 276, 285 (W.D.N.Y. 2019) (collecting cases); *Cross v. King*, No. 14-CV-7394, 2015 WL 6438819, at *4 (E.D.N.Y. Oct. 22, 2015) ("A declaratory judgment for alleged retrospective misconduct with no continuing violation of federal law is barred by the absolute immunity doctrine." (citations omitted)).

Here, the declaratory relief that Plaintiff seeks is purely retrospective. Plaintiff requests that the Court issue a declaratory judgment stating that Defendants violated the *Accardi* doctrine and the Fourteenth Amendment by "failing to follow their own rules" and "fail[ing] to curb" the violation of these rules. (SAC ¶ 52(A).) In particular, Plaintiff alleges violations associated with Defendants' conduct during his November 14, 2017 and April 17, 2018 Parole hearings. Both of these hearings are, of course, discrete events in the past. Moreover, Plaintiff does not claim that these violations are ongoing. To the contrary, Plaintiff agrees that his most recent denial of parole fully accorded with his interpretation of the New York State regulations because the panel at his April 17, 2019 hearing "followed the mandate" of the state regulations. (*Id.* ¶ 36). Accordingly, because Plaintiff has alleged no ongoing harm or violation but only violations in the past, declaratory relief would be improper. *See Morales v. City of New York*, 59 F. Supp. 3d 573, 581–82 (S.D.N.Y. 2014) (rejecting a request for declaratory relief where the plaintiff asked

the court "only to recognize a past wrong"); *Ippolito v. Meisel*, 958 F. Supp. 155, 161 (S.D.N.Y. 1997) (characterizing a request for declaratory relief as "nothing more than a request for a declaration of a violation of federal law where there is no continuing violation to enjoin, and is thus barred against defendants" (citation and quotation marks omitted)). As Plaintiff is entitled neither to damages nor to declaratory relief, his Second Amended Complaint is dismissed.

### III. Conclusion

For the reasons stated above, Defendants' Motion is granted. Because this dismissal is based on legal conclusions concerning the applicability of absolute immunity and the absence of "clearly established law," the Court concludes that amendment would be futile. *See Bogart v. City of New York*, No. 13-CV-1017, 2015 WL 5036963, at *8 (S.D.N.Y. Aug. 26, 2015) (denying leave to amend, for futility, because the defendants did not "def[y] clearly established law"); *Karris v. Varulo*, No. 14-CV-1077, 2014 WL 1414483, at *4 (E.D.N.Y. Apr. 10, 2014) ("[A]ny amendment to [the] plaintiff's amended complaint would be futile because, inter alia, all defendants are entitled to absolute immunity . . . ." (italics omitted)); *Dilacio v. N.Y.C. Dist. Council of the United Bhd. of Carpenters & Joiners of Am.*, 593 F. Supp. 2d 571, 578 (S.D.N.Y. 2008) (denying leave to replead, for futility, because defendant was "absolutely immune" from suit). Accordingly, and because Plaintiff has already amended his Complaint twice, dismissal is with prejudice. *See Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ("[T]he district court has the discretion to deny leave [to amend] if there is a good reason for it, such as futility . . . ." (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015) ("[A] party may amend its pleadings more than once 'only with the opposing party's written consent or the court's leave.'" (quoting Fed. R. Civ. P. 15(a)(2))).

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 43), mail a copy of this Opinion and Order to Plaintiff, and close the case.

SO ORDERED.

Dated:   December  _11_ , 2019
         White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE